RAYMOND R. ABRAMSON, Judge
Rashad Williams appeals the Crittenden County Circuit Court order terminating his parental rights to his son, L.C. (born in November 2013). On appeal, Williams argues that termination was clearly erroneous due to the denial of due process and the lack of evidence to support the circuit court's best-interest finding. We affirm.
On October 26, 2016, the Arkansas Department of Human Services (DHS) filed a petition for emergency custody and dependency-neglect of L.C. and his three half siblings. The petition listed Lola Conner[1] as L.C.'s mother and Williams as L.C.'s father. The petition further indicated that Williams was incarcerated in the Arkansas Department of Correction (ADC). The petition also included the fathers of L.C.'s half siblings. In the affidavit attached to the petition, DHS alleged that Conner had stabbed one of L.C.'s half siblings twenty times. On October 28, 2016, the circuit court entered an ex parte order for emergency custody.
On November 1, the court entered a probable-cause order. The court ordered the parties to comply with the case plan, watch "The Clock is Ticking", complete parenting classes, and obtain stable housing and employment.
On February 21, 2017, the court adjudicated L.C. dependent-neglected due to Conner's physical abuse of a child, and the court also found aggravated circumstances. The court set concurrent goals of adoption and relative placement.
On June 6, DHS filed a petition to terminate Williams's and Conner's parental rights. On June 20, the court entered a review order. The court noted that L.C.'s paternal grandmother, Felicia Linell, had inquired about placement of L.C. but that DHS had recommended placing L.C. with his half siblings.
On July 10, Williams filed a "written answer to the complaint or a motion under Rule 12 of the Arkansas Rules of Civil Procedure." In the answer, Williams denied harming L.C. and asked the court to temporarily transfer his parental rights to his mother. He also stated that he wanted to attend the termination hearing.
*405 On August 15, the court entered a permanency-planning order. The court noted that DHS was completing a packet for Linell through the Interstate Compact Placement of Children (ICPC) in Texas and that DHS would notify the court of the results.
On January 19, 2018, the court entered an order terminating Conner's parental rights; however, the court "dismissed" Williams. The court made a handwritten note that Williams "needed conflict counsel."
On July 9, the court entered a permanency-planning order. The court found that placement of L.C. with Williams was contrary to the child's best interest because Williams remained incarcerated. The court authorized DHS to file a petition for termination of Williams's parental rights, and counsel was appointed for Williams. The court set a termination hearing for September 28.
On July 18, DHS filed a petition to terminate Williams's parental rights. DHS alleged the failure-to-remedy,[2] subsequent-factors,[3] imprisonment,[4] and aggravated-circumstances grounds.[5] On September 28, the court continued the termination hearing to October 16 on Williams's counsel's request.
At the termination hearing, Demetria Wills, the DHS caseworker, testified that L.C. had been removed from Conner's custody in October 2016 because Conner had stabbed L.C.'s half sibling. She stated that L.C. was two years old at the time. She explained that when L.C. was taken into DHS custody, DHS did not know the whereabouts of Williams. She testified that the Pine Bluff child-support office sent her an order showing that Williams's paternity had been established by a DNA test on April 10, 2014. In September 2017, Wills learned that Williams was incarcerated for a second-degree-murder conviction and that he was scheduled to be released in 2030.[6] She stated that DHS did not offer Williams services, did not send him copies of the court's orders or the case plan, and did not attempt to schedule visitations with L.C. She noted that Williams would not be released from prison until after L.C. had reached the age of majority. Wills testified that Williams's mother had contacted DHS about obtaining custody of L.C. and that she had initiated the ICPC process with her. She also stated that L.C. was placed in a foster home with his half siblings and that his foster parents are interested in adopting him. She testified that he is adoptable.
Williams testified that he had been imprisoned at the Varner Unit in Grady, Arkansas, since June 2016. He explained that he had pled guilty to second-degree murder and that he had received a thirty-year sentence. He stated that he will serve about seven and a half years, but he noted that he had been cited for different disciplinary violations that could prolong his release date. He testified that he had completed an anger-management class and that he was on a waiting list for parenting classes.
Williams stated that DHS did not notify him that L.C. had been taken into custody.
*406 His mother informed him, and she learned about Conner's arrest from the internet. He acknowledged that he did not immediately contact DHS but explained that DHS is not on his call list. Williams stated that his mother had tried to contact DHS on his behalf. He testified that DHS did not send him a case plan or notify him of any hearings before the termination hearing. He stated that ADC permits visitations but that DHS did not transport L.C. to visit him. Williams explained that when he received the petition to terminate his parental rights, he wrote DHS a letter requesting a lawyer. He did not write a letter earlier because he did not know to whom and where to send it.
Williams asked the court to grant his mother custody of L.C. He stated that his mother had tried to obtain custody of L.C. but that DHS had not given her any information. He admitted that his mother had been convicted of second-degree murder in 1997. He stated that if the court did not grant his mother custody of L.C., he wanted his grandmother to have custody of the child. Williams explained that his grandmother lives in Pine Bluff but that DHS had not contacted her about L.C.
Following the hearing on November 20, 2018, the court entered an order terminating Williams's parental rights. The court found that both the imprisonment ground and the aggravated-circumstances ground supported termination. The court further found that it was in L.C.'s best interest to terminate Williams's parental rights. In making the finding, the court considered the likelihood that L.C. would be adopted and the potential harm that would be caused by placing the child with Williams. As to potential harm, the court found that L.C. would be subjected to potential harm because Williams was incarcerated in ADC for a thirty-year sentence since he had pled guilty to second-degree murder. Williams timely appealed the termination order to this court.
We review termination-of-parental-rights cases de novo but will not reverse the circuit court's ruling unless its findings are clearly erroneous. Dade v. Ark. Dep't of Human Servs. , 2016 Ark. App. 443, 503 S.W.3d 96. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. Id. In determining whether a finding is clearly erroneous, we have noted that in matters involving the welfare of young children, we will give great weight to the circuit court's personal observations. Jackson v. Ark. Dep't of Human Servs. , 2016 Ark. App. 440, 503 S.W.3d 122.
The termination of parental rights is an extreme remedy and in derogation of the natural rights of the parents. Fox v. Ark. Dep't of Human Servs. , 2014 Ark. App. 666, 448 S.W.3d 735. As a result, a heavy burden is placed on the party seeking to terminate the relationship. Id. The termination of parental rights is a two-step process that requires the circuit court to find that the parent is unfit and that termination is in the best interest of the child. T.J. v. Ark. Dep't of Human Servs. , 329 Ark. 243, 947 S.W.2d 761 (1997) ; Smith v. Ark. Dep't of Human Servs. , 2013 Ark. App. 753, 431 S.W.3d 364. The first step requires proof of one or more of the statutory grounds for termination. Ark. Code Ann. § 9-27-341(b)(3)(B). The second step requires consideration of whether the termination of parental rights is in the child's best interest. Ark. Code Ann. § 9-27-341(b)(3)(A).
On appeal, Williams first argues that the circuit court erred in terminating his parental rights because DHS abrogated its duty to provide him with copies of the case plan, the court orders, or any of the pleadings in the case. He points out *407 that the DHS caseworker testified that she did not try to locate him for almost a year after DHS had obtained custody of L.C. He argues that DHS failed to permit him to have any meaningful participation in the case, thereby depriving him of due process.
However, Williams did not a raise a due-process argument to the circuit court. Even in termination cases, we will not address arguments raised for the first time on appeal. Lyons v. Ark. Dep't of Human Servs. , 2009 Ark. App. 271. A party cannot change an argument on appeal and is bound by the scope of the arguments made to the circuit court. Andrews v. Ark. Dep't of Human Servs. , 2012 Ark. App. 22, 388 S.W.3d 63 (citing Holiday Inn Franchising, Inc. v. Hotel Assocs., Inc. , 2011 Ark. App. 147, 382 S.W.3d 6 ). Because no specific due-process argument was raised below, this point is not preserved for our review.[7]
Williams also argues that the circuit court erred in finding that it was in L.C.'s best interest to terminate his parental rights. He does not challenge the court's adoptability finding. Instead, he argues that there was insufficient evidence to show that he posed a potential harm to L.C. He asserts that there was no evidence that he ever hurt the child. He further points out that even though he received a thirty-year sentence for second-degree murder, he could be released earlier, and placement with a relative could allow him the opportunity to help raise L.C. after his release.
In determining the best interest of the juvenile, a circuit court must take into consideration (1) the likelihood that the juvenile will be adopted if the termination petition is granted and (2) the potential harm, specifically addressing the effect on the health and safety of the child, caused by returning the child to the custody of the parent. Myers v. Ark. Dep't of Human Servs. , 2011 Ark. 182, 380 S.W.3d 906. In considering potential harm caused by returning the child to the parent, the circuit court is not required to find that actual harm would result or affirmatively identify a potential harm. Welch v. Ark. Dep't of Human Servs. , 2010 Ark. App. 798, 378 S.W.3d 290. Potential harm must be viewed in a forward-looking manner and in broad terms, including the harm the child suffers from the lack of a stable, permanent home. Collins v. Ark. Dep't of Human Servs. , 2013 Ark. App. 90.
In this case, we hold that there was no error in the circuit court's potential-harm finding. The evidence showed that Williams began serving a thirty-year prison sentence for second-degree murder in 2016-just two years before the termination hearing when L.C. was two years old. The duration of Williams's prison sentence as well as the violent nature of the offense supports the court's potential-harm finding. Further, as to relative placement, Williams's mother also has a second-degree-murder conviction, and his grandmother did not appear at the termination hearing. We therefore hold that the circuit court did not err in finding potential harm and that it was in L.C.'s best interest to terminate Williams's parental rights.
Affirmed.
Gruber, C.J., and Harrison, J., agree.

Conner is not a party to this appeal.

Ark. Code Ann. § 9-27-341(b)(3)(B)(i)(b) (Supp. 2017).

Ark. Code Ann. § 9-27-341(b)(3)(B)(vii)(a) .

Ark. Code Ann. § 9-27-341(b)(3)(B)(viii)(a) .

Ark. Code Ann. § 9-27-341(b)(3)(B)(ix)(a)(3)(A) & (B) .

Wills acknowledged that the petition for emergency custody indicated that Williams was incarcerated, but she had not read the petition until the day of the termination hearing.

We recognize that at the termination hearing, Williams moved for a directed verdict on the subsequent-factors ground and argued that the evidence was insufficient to support that ground because DHS did not provide him with pleadings, orders, or the case plan. He did not, however, make a due-process argument.